**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00436-CV**
_____

**IN THE INTEREST OF M.C.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 17-09-10801-CV**

**MEMORANDUM OPINION**

Appellant June[1] appeals from an order terminating her parental rights to her minor son, M.C. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2) (West Supp. 2018). In issues one, two, and three, June challenges the legal and factual sufficiency of the evidence supporting the trial court's conclusion that June (1) knowingly placed or knowingly allowed M.C. to remain in conditions or surroundings which endanger M.C.'s physical or emotional well-being, (2) engaged

---

[1] To protect the identity of the minor, we use the initials M.C. for the child and the pseudonym "June" for M.C.'s mother. *See* Tex. R. App. P. 9.8(b)(2). The trial court's order of termination also terminated the parental rights of M.C.'s unknown father. The unknown father was represented by an attorney ad litem at trial.

1

in conduct or knowingly placed M.C. with persons who engaged in conduct which endangers M.C.'s physical or emotional well-being, or (3) failed to comply with the provisions of a court-ordered parenting plan. In issue four, June challenges the legal and factual sufficiency of the evidence supporting the finding that termination of her parental rights was in M.C.'s best interest. Because we conclude that the evidence admitted at trial sufficiently supports the trial court's order of termination, we affirm.

## Background

The Texas Department of Family and Protective Services ("the Department") removed six-year-old M.C., who is autistic, after a referral alleging neglectful supervision by June and June's mother. According to the report, June and her mother, with whom M.C. lived, had an altercation after June confronted her mother about drug use. June tested positive for cocaine and her mother tested positive for methamphetamines.

June testified that M.C. was born on October 6, 2010, and M.C. and June initially lived with June's sister. When M.C. was six months old, June was incarcerated, and M.C. went to live with June's mother.

June testified that she had previously been convicted more than six times for crimes that included "drug cases, prostitution cases, [and] assault." June also admitted that since M.C.'s birth she had been arrested at least twice for felony

prostitution (third or more), twice for criminal trespass, once for felony manufacturing of a controlled substance, once for possession of cocaine, and once for felony aggravated assault causing serious bodily injury when she allegedly pulled a knife on her boyfriend during a domestic dispute. June testified that M.C. was not living with her at the time of these criminal cases, but he was living with June's mother.

According to June, she mistakenly believed her mother obtained custody of M.C. when June was on drugs and June's mother "had [June] sign some paperwork." June testified that M.C. lived out of state for a while with June's mother and June visited them "two to three times a month[,]" and then June's mother and M.C. ultimately moved back to Montgomery County, where June would visit them "every couple of months." According to a judgment dated April 24, 2017, June pleaded guilty to assault causing bodily injury to a family member and she was sentenced to five years in jail, probated for four years.

According to June, in June or July of 2017, she went to stay a week with her mother and M.C. and she learned her mother was using drugs. June testified that in August of 2017 she went to her mother's house and they had a disagreement because June wanted her son back and that is when June was arrested because she and her mother "had a physical altercation over [M.C.]" June testified that her mother was

3

"high on meth" and that June did not think it was appropriate for M.C. to stay with her mother at that time.

A Judgment Revoking Community Supervision was admitted into evidence and it indicates that on May 15, 2018, June pleaded "true" to the State's motion to revoke June's community supervision and she was convicted of assault causing bodily injury to a family member and sentenced to two years in jail. At the time of trial, June was incarcerated and serving the two-year sentence. According to June, she had been denied parole and the earliest she could be released would be January 30, 2019.

June also testified she was on probation when she signed her service plan in October 2017, and nothing had been filed to revoke her probation at that time. The service plan June signed was admitted into evidence, and it required June to provide her caseworker proof of employment and housing, to participate in and successfully complete a psychological evaluation by Dr. Paul Damin, to participate in and successfully complete a drug and alcohol assessment with BES Group Associates, and to submit to random drug testing. According to June, she arrived at the wrong time for the psychological evaluation and returned at a re-scheduled time, but she was unable to stay long enough for Dr. Damin to complete the evaluation. June testified that she went to take the drug and alcohol assessment but "the woman told

4

me that I was there the wrong day [and] kept trying to reset me every time I went up there." According to June, she submitted to one drug test that she failed, and she had taken "two X pills when [she] first got released from jail [and] they said [she] had low levels of cocaine in [her] system." June admitted she did not obtain stable employment or stable housing as required by her service plan. According to June, prior to going into prison she did not complete any of the required items on her service plan. June stated that prior to her incarceration her abusive boyfriend would not "allow [her] to do certain things at times[]" to complete her service plan, she did not get a chance to complete her service plan, and she stated she wants another chance. June testified that she knows she "messed up, but [she] didn't realize how serious it was at the time."

June admitted that she told the parole board that, upon her release, she would return to her abusive boyfriend and that she had no arrangements for employment. June testified that since the parole board hearing she changed her mind about her arrangements upon release and she had requested that she be released to a halfway house that would allow for M.C. and her other children to live with her. June testified that she had no job prospects upon release and that she would apply for food stamps. June explained that she could possibly do secretarial work for her sister who owned a travel agency or do manual labor for the same sister who also remodels houses,

5

and that she has helped her sister with these jobs in the past. According to June, while incarcerated she has taken the "Changes" class which addresses anger, drugs, stress management, and parenting, but at the time of trial she still had two months remaining before she could complete the class. June also testified that she is "on the wait list for parenting and cognitive classes."

June agreed that she had two other children who do not live with her, but she stated that prior to this case she had "never had a CPS case before." June testified that she last saw M.C. about six months prior to trial, and that she had seen M.C. four or five times at visitations since the beginning of the CPS case. June does not know the identity of M.C.'s father. According to June, M.C. has many physical needs and she has never had any training on how to take care of him.

Child Protective Services Investigator Casandra Davis testified that in September 2017 she was assigned to investigate allegations that M.C.'s grandmother, with whom M.C. was living, was using drugs. Davis testified that as part of the investigation she interviewed June after June was released from jail. Davis testified that when she asked June about why June had been arrested, June told her that she had been at her mother's house on the day of her arrest and that she suspected her mother was using meth. As part of the investigation, both June and her mother submitted to drug tests. Based on Davis's conversations with the two women, Davis

6

felt it was not appropriate for M.C. to stay with June or June's mother. According to Davis, June provided a name of a family friend who could take care of M.C. but after one night of M.C. being in that home, the family friend called Davis and said she could not handle the child. Davis testified that the only other friend or relative outside of foster care that would have been an appropriate placement for M.C. was June's sister, but the sister was unwilling to care for M.C.

Maria Garza also worked on the case for the Department. Garza testified that she took over the case from the investigator. Garza developed a service plan for June, met with June, and had June sign the service plan. According to Garza, June did not complete any element of the service plan. Garza acknowledged that the service plan was never modified upon June's incarceration to include elements June could complete while incarcerated. According to Garza, June did not provide any information that demonstrates June could provide appropriately for M.C., and Garza did not believe that M.C. would be safe if he were placed with June. Garza testified that June had been incarcerated since May 2018. According to Garza, June has not seen M.C. since November 20, 2017. Garza testified that to her knowledge, June had not sent any letters or anything to communicate with M.C. during her incarceration and June has had no contact with M.C. during her incarceration.

M.C.'s foster mother (hereinafter Foster Mother), who is also a special education teacher, testified that M.C. was placed with her on September 7, 2017, when he was six years old, and he had been living with her for the past year. According to the Foster Mother, when M.C. arrived at her house "his behavior was out of control[]" and he had taken off everything but his underwear on his way from the caseworker's vehicle to the Foster Mother's house. The Foster Mother testified that M.C. is autistic and speech impaired, behind in grade level, and that she enrolled him in a life skills class for children with autism and intellectual disabilities. According to the Foster Mother, M.C. requires occupational and speech therapy, and sees a psychologist monthly. The Foster Mother believes that M.C. has "really progressed[,]" and that he was doing better with a structured routine, which was something he did not have prior to coming into her care. M.C. still has "sporadic temper tantrum[s]" that last at least thirty minutes, and if taken out of his routine, his bad behaviors surface. M.C. requires a lot of extra effort, and the Foster Mother is trying to get him a one-on-one paraprofessional teacher's aide at school to assist him. According to the Foster Mother, after M.C. visits with June and June's mother, he reverts to prior behaviors such as using profanity, kicking, biting, pinching, and wetting the bed. Although the Foster Mother is not a permanent placement for M.C., she has identified a worker at his daycare that works with M.C. daily before and after

school and the daycare worker should be considered as a possible permanent placement.

The Court-Appointed Special Advocate (CASA) for M.C. testified that she is the guardian ad litem for M.C. and has been interacting with the child for almost a year. She testified she observed two visits between M.C., June, and June's mother, and it appeared M.C. had a relationship with them. According to the CASA, M.C.'s current placement is meeting all of his needs and he has improved in his current placement. The CASA testified that she believes M.C. needs a lot of supervision and structure and that he is receiving that in his current placement. The CASA has also met and spoken with an individual who has come forward as a possible permanent placement for M.C. Although she has only seen them together on a minimal basis, the CASA understands that the individual has spent a lot of time with M.C. at the daycare. The CASA agrees the termination of June's parental rights would be in M.C.'s best interest.

The trial court found clear and convincing evidence that June: (1) knowingly placed or knowingly allowed M.C. to remain in conditions or surroundings which endanger M.C.'s physical or emotional well-being; (2) engaged in conduct or knowingly placed M.C. with persons who engaged in conduct which endangers M.C.'s physical or emotional well-being; and (3) failed to comply with the

9

provisions of a court order that specifically established the actions necessary for June to obtain the return of M.C. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), and (O). The trial court found termination to be in the child's best interest. June appealed.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment of termination if any one of the grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C.*, No. 09-10-00477-CV, 2011 Tex. App. LEXIS 3385, at **13-14 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.).

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief

10

or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d at 86-87).

Statutory Grounds for Termination

In issue two, June challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that she engaged in conduct or knowingly placed

11

M.C. with persons who engaged in conduct which endangers M.C.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). According to June, "[n]o evidence was provided from any witness that [June] knowingly placed or left the child in a situation she knew to be dangerous[,]" and that the case started when June confronted her mother about her mother's drug usage and June tried to retrieve M.C.

Termination may be ordered under subsection E if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* Under subsection E, the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (citing *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ)). In this context, endanger means "'to expose to loss or injury; to jeopardize.'" *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). A child is endangered when the environment or a parent's

12

conduct creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Termination under subsection E must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383; *see also In re J.O.A.*, 283 S.W.3d at 345 (concluding that endangering conduct is not limited to actions directed toward the child). The specific danger to a child's well-being may be inferred from parental misconduct. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Courts may consider parental conduct that did not occur in a child's presence, including conduct before the child's birth and after the child was removed by the Department. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739

13

(Tex. App.—Fort Worth 2004, pet. denied). Although incarceration alone will not support termination, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection E. *See In re A.R.M.*, No. 14-13-01039-CV, 2014 Tex. App. LEXIS 3744, at *21 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.); *In re J.T.G.*, 121 S.W.3d at 133. In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.— Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree*, 907 S.W.2d at 84; *see also In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker*, 312 S.W.3d at 617 (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). Abusive or violent conduct by a parent may also produce a home

environment that endangers a child's well-being. *In re J.I.T.P*., 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

The trial court heard evidence regarding June's pattern of drug use and drug convictions during M.C.'s lifetime, June's family violence assault convictions and physical altercations with her mother and boyfriend, June's criminal history and incarcerations, and June's inability to provide proof of stable housing and employment. June's drug use, prostitution, incarcerations, incidents of domestic violence, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could have determined June endangered M.C.'s emotional and physical well-being. *See In re Z.N.M.*, No. 14-17-00650-CV, 2018 Tex. App. LEXIS 333, at *16 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.); *see also Boyd*, 727 S.W.2d at 534; *In re V.V*., 349 S.W.3d 548, 553-54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re D.O.*, 338 S.W.3d 29, 36-37 (Tex. App.—Eastland 2011, no pet.). Reviewing all the evidence in the light most favorable to the termination findings under subsection E, the trial court could reasonably have formed a firm belief or conviction that June, through her acts or omissions, endangered M.C.'s physical or emotional well-being. Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief

15

or conviction that termination of June's parental rights was warranted under subsection E. We conclude the Department established, by clear and convincing evidence, that June committed the predicate act enumerated in section 161.001(b)(1)(E).

Having concluded that the evidence is legally and factually sufficient to support the trial court's finding of endangerment under section 161.001(b)(1)(E), we need not discuss June's challenge to the court's findings under section 161.001(b)(1)(D) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule issues one through three.

Best Interest of the Child

In her fourth issue, June challenges the legal and factual sufficiency of the evidence supporting the finding that termination of her parental rights is in M.C.'s best interest. According to June, there is testimony as to the bond she had with M.C., and that the trial court should have sustained June's objections to certain testimony and excluded the objected-to evidence that "contaminated" the best-interest analysis.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). Nevertheless, there is a strong presumption that the best interest of a child is served by keeping the child with his or her parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*,

16

374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2018).

The Family Code outlines factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child. *Id.* § 263.307(b). There are several factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311

17

(Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in M.C.'s best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

We have already explained that the evidence presented at the trial shows that June had a history of criminal behavior and a history of substance abuse. During the trial, June testified that for most of M.C.'s life, she was not the person caring for him, and the evidence indicated June had little contact with him after the Department removed M.C. because she was incarcerated. The trial court heard evidence of M.C.'s special needs, that his needs were being met in his current placement, and there is a person for permanent placement who understood his needs because she worked daily with M.C. before and after school. Based upon the evidence of June's propensity for violence and history of substance abuse, the fact that she had been in

18

and out of jail, that she never took much of a role in parenting M.C., and M.C.'s need for structure and routine, the trial court could have reasonably concluded that June does not have the ability or skills required to adequately care for M.C., and that June's problems have interfered with her ability to be a full-time parent for M.C. There is testimony in the record showing that June cannot currently provide M.C. with a stable place to live, and that June does not have a stable work history. We conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding.

As part of her fourth issue, June complains that the trial court erred in admitting over objection (1) Foster Mother's testimony that M.C. would be at a risk for regressing if someone did not have the time or ability to provide M.C. with the extra effort he requires because such testimony is a speculative response by a non-expert, (2) Foster Mother's testimony about what "they told" her about the necessity for keeping a routine and consistency is hearsay, and (3) the CASA's testimony that she had seen M.C. interact with the person who was a possible permanent placement as the testimony was not relevant and speculative. June cites no rules or case law supporting her conclusory evidentiary arguments and only provides a record reference to one of her evidentiary arguments. It is not our duty to review the record, research the law, and then fashion a legal argument for an appellant when the

appellant has failed to do so. *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931-32 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Briefing waiver occurs when a party fails to make proper citations to authority or to the record or provide any substantive legal analysis. Tex. R. App. P. 38.1(i); *Canton-Carter*, 271 S.W.3d at 931. Even though we are required to interpret appellate briefs reasonably and liberally, parties asserting error on appeal still must put forth some specific argument and analysis citing the record and authorities in support of their argument. *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Even absent briefing waiver, and even assuming without deciding that the admission of the objected-to testimony was error, we cannot conclude that the admission probably caused the rendition of an improper termination judgment against June or that its admission probably prevented June from properly presenting her appeal to this court. *See* Tex. R. App. P. 44.1(a). To determine harm under rule 44.1(a), we must review the entire record, "considering the 'state of the evidence, the strength and weakness of the case, and the verdict.'" *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008) (quoting *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 841 (Tex. 1979)). "[A]dmission . . . is likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the

error likely made no difference." *Id.* at 873 (footnotes omitted). In other words, a "successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence . . . admitted." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Based on the record before us, we have concluded that there is sufficient evidence that is separate and apart from the objected-to testimony that supports the trial court's finding that termination of June's parental rights was in M.C.'s best interest. In other words, the errors, if any, likely made no difference to the trial court's best-interest determination. *See In re C.C.*, 476 S.W.3d 632, 638 (Tex. App.—Amarillo 2015, no pet.); *In re D.O.*, 338 S.W.3d at 37-38; *see also Nat. Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 410 (Tex. App.—Amarillo 2003, pet. denied) (holding erroneous admission of evidence in a bench trial does not warrant reversal when other record evidence supports the trial court's decision). We overrule June's fourth issue.

We affirm the trial court's order of termination.

AFFIRMED.

                                        _____
                                        LEANNE JOHNSON
                                        Justice

Submitted on February 12, 2019
Opinion Delivered April 11, 2019

Before McKeithen, C.J., Kreger and Johnson, JJ.